1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
                                  AT SEATTLE

8  JUSTIN COUNTRYMAN,

9                        Plaintiff,              Case No. C19-01767-JCC-SKV

10        v.                                     REPORT AND RECOMMENDATION

11 DAVID SHERMAN, et al.,

12                        Defendant.

13

14        Plaintiff is a state prisoner currently housed at Monroe Correctional Complex (MCC),

15 who is proceeding *pro se* and *in forma pauperis* in this 42 U.S.C. § 1983 civil rights action.

16 Dkts. 4 & 68.  Plaintiff alleges the Department of Corrections (DOC), and various DOC

17 employees violated his rights under the Religious Land Use and Institutionalized Persons Act

18 (RLUIPA), the First, Fourteenth and Eighth Amendments of the United States Constitution, and

19 state law.  Dkt. 68.  Plaintiff's claims relate to the DOC Passover meal sign-up policy which was

20 in place at MCC in 2019.  *Id.*

21        Defendants have filed a motion for summary judgment which Plaintiff has opposed.

22 Dkts. 78, 87, 89.  Having considered the parties' submissions, the balance of the record, and the

23 governing law, the undersigned recommends that Defendants' motion for summary judgment,

Dkt. 78, be GRANTED, as provided below, and that Plaintiff's federal claims under RLUIPA, the First Amendment Free Exercise Clause, the Eighth Amendment, the Fourteenth Amendment Due Process Clause, and Plaintiff's Fourteenth Amendment Equal Protection claim alleging intentional discrimination based on membership in a protected class, be dismissed with prejudice.  The undersigned further recommends that the Court dismiss without prejudice Plaintiff's other federal claims purportedly raised under the other clauses of the First Amendment (Establishment Clause, Freedom of Expression Clause, Freedom of Speech Clause, and Right of Expressive Association Clause) and Plaintiff's "class of one" Fourteenth Amendment Equal Protection claim.  If the Court adopts the recommendation to dismiss Plaintiff's federal claims, the undersigned further recommends that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss those claims without prejudice.

## BACKGROUND

Plaintiff's second amended complaint[1] names the following Defendants: DOC; David Sherman, Chaplain at MCC; Belinda Stewart, Corrections Program Administrator at DOC; Brian King, Food Services Administrator at DOC; Jack Warner, Superintendent at MCC; Mark Miller, Corrections Program Manager at MCC; Scott Russell, Deputy Director of Command A at DOC; and Dawn Taylor, Correctional Specialist 4 for Programs and Services Unit at DOC.  Dkts. 68 & 74.  Plaintiff alleges Defendants Sherman, Stewart, King, Miller, Russell, and Taylor violated his rights under RLUIPA and the First Amendment[2] by participating in developing the requirements

---

[1] The second amended complaint is the operative complaint in this action.  Dkt. 68.

[2] Plaintiff's second amended complaint alleges the Defendants violated his First Amendment rights under the Free Exercise Clause, the Establishment Clause, Freedom of Expression Clause, Freedom of Speech Clause, and Right of Expressive Association Clause, but Plaintiff presents facts and substantive argument only in support of his Free Exercise claim.  Dkt. 68 at 10.

1    and procedures for the DOC 2019 Passover sign-up policy which prevented his participation in

2    Passover meals in 2019.  Dkt. 68 at 4.  Plaintiff also alleges the Defendants also took part in

3    carrying out the procedures or put the policy and procedures into motion.  *Id.* at 5.  Plaintiff

4    alleges the 2019 Passover sign-up policy required at least one of three criteria be met in order for

5    an inmate to sign up for and receive Passover meals and that these criteria violated his rights by

6    (1) requiring prisoners show dietary practice was compelled by religion, (2) requiring offenders

7    participate in a particular religion in order to practice their own belief, and (3) arbitrarily

8    prohibiting religious beliefs.  *Id.*

9         Plaintiff alleges Defendants Warner, Sherman, Stewart, King, Miller, Russell, and Taylor

10   also violated his rights to Due Process and Equal Protection under the Fourteenth Amendment.

11   *Id.* at 15-16.  Plaintiff alleges Defendant Warner upheld the denial of his grievance related to the

12   2019 Passover policy and failed to correct the violation of his rights.  *Id.*  Plaintiff alleges

13   Defendant Russell reviewed his complaint and failed to correct the violation.  *Id.*  He alleges

14   Defendants Sherman, Stewart, King and Miller failed to raise concerns to their superiors

15   regarding the violations.  *Id.*  Plaintiff alleges these actions by Defendants violated his right to

16   Due Process.  *Id.*  Plaintiff also alleges Defendants violated his right to Equal Protection because

17   no other religious group had the same policies/regulations/restrictions placed on them in order to

18   attend their religious feast.  *Id.*

19        Plaintiff alleges Defendants Sherman, Stewart, King, Miller, Russell, and Taylor, violated

20   his Eighth Amendment rights because preventing his participation in Passover constituted "cruel

21   and unusual punishment."  *Id.*  Plaintiff further alleges Defendants DOC, Taylor, Russell,

22   Stewart, King, Miller, and Sherman also violated his rights under "Article I § 11, Amendment #4

23

1    – Religious Freedom", of the Washington State Constitution by creating and participating in

2    application of the 2019 Passover sign-up policy.  *Id.*

3          As a result of Defendants' actions, Plaintiff alleges he suffered mental and emotional

4    distress, stress, sleeplessness, anxiety, as well as "physical deprivation from participating in his

5    religious beliefs."  *Id.*  As relief, Plaintiff seeks compensatory or presumed damages, punitive

6    damages and "any other relief that the Court may deem just an[d] proper."  *Id.*

7          Defendants move for summary judgment, Dkt. 78, and present the following evidence:

8          For the 2018 fiscal year, the DOC spent over $7,000,000.00 in food costs for MCC

9    inmates alone and more than $47,000,000.00 statewide.  Dkt. 36 at 1-2, Decl. of Brian King;

10   Dkt. 36-1, at 2-3.  Agencywide, the cost per meal was about $2.52 in 2018.  *Id.*  For MCC, the

11   cost per meal was about $2.79.  *Id.*  As one part of the celebration of Passover, the DOC offers

12   Food Services Passover meals which provide specialized food in the dining hall for eight days.

13   Dkt. 38 at 2, Decl. of Belinda Stewart; Dkt. 36 at 2.  Consistent with the Jewish tradition, meals

14   offered through the Passover option do not contain leavened foods or other fermented products.

15   Dkt. 36 at 2.  Inmates wishing to receive the eight days of Food Services Passover meals in the

16   dining hall needed to sign up ahead of time to participate.  Dkt. 38 at 2.  Prior to 2017, there was

17   no criteria for inmate approval for Passover meal participation.  *Id.*  As long as the inmate signed

18   up to participate by the deadline, they were approved to receive the Passover meals.  *Id.*

19   According to Belinda Stewart's declaration, "[a]fter a review, it was determined the Department

20   was spending a large amount of resources preparing meals for inmates participating in Passover

21   which it could no longer maintain, with the thought that the Department was likely now

22   providing Passover meals to inmates who wanted them out of curiosity and not for a religious

23   purpose, due to the large increase in meals."  *Id.*  In 2016, the Passover meals cost about $130.65

1    per participant for all of the Passover meals.  Dkt. 36 at 2; Dkt. 36-1 at 5.  This cost does not

2    factor in labor costs associated with the meal preparation.  *Id.*  In 2016, 1,838 inmates

3    participated in Passover meals resulting in a total expense estimate of $239,820.  *Id.*

4         In 2017, the Department issued a set of criteria for inmate participation in the Food

5    Services Passover meals.  Dkt. 38 at 2-3; Dkt. 38-1 at 2-4.  The Jewish Federation of Greater

6    Seattle provided consultation on providing religious access to Jewish inmates.  *Id.*  After review

7    of their recommendations, the determination was made to set criteria for Passover meal

8    participation to inmates who had a history of participating in other aspects of the Jewish faith

9    than just the receipt of the Passover meals.  *Id.*  In order to be approved, an inmate had to submit

10   his request by the deadline and also be a current kosher meal participant or a non-kosher meal

11   participant with demonstrated participation in Jewish, Messianic, Christian or religious

12   programming applicable to the Jewish faith over the past twelve months.  *Id.*  The prison

13   chaplains and inmates were notified of the new criteria through memoranda.  *Id.*  In 2017, 561

14   inmates participated in Passover meals resulting in a total expense estimate of $69,931.  Dkt. 36

15   at 2; Dkt. 36-1 at 5.  The cost per participant was about $124.65.  *Id.*

16        The criteria for inmate participation in the Food Services Passover meals were changed

17   again before the 2018 Passover meal.  Dkt. 38 at 3; Dkt. 38-1 at 6-11.  The criteria were

18   modified to create three categories of participation.  *Id.*  In order to be approved, an inmate had

19   to submit his request by the deadline and also be a current kosher meal participant or a non-

20   kosher meal participant with demonstrated participation in Jewish, Messianic, or religious

21   programming applicable to the Jewish faith over the past six months.  *Id.*  For inmates who did

22   not fit the first two criteria, a third category was created where the inmate could submit a written

23   explanation as to why they should be allowed to participate in Passover.  *Id.*  Those who applied

1    through option 3 would be approved or denied at the discretion of the facility chaplain, meaning

2    the facility chaplain had the choice to say yes or no based on information from the applicant. *Id.*

3    The prison chaplains and inmates were again told of the new criteria through memoranda. *Id.*

4         The criteria for the 2019 Passover meal were the same as the 2018 criteria. Dkt. 38 at 3;

5    Dkt. 38-1 at 13-18. In 2018, 498 inmates participated in Passover meals resulting in a total

6    expense estimate of $63,346. Dkt. 36 at 2; Dkt. 36-1 at 5. The cost per participant was about

7    $127.20. *Id.* For 2019, 495 inmates participated in Passover meals resulting in an expense

8    estimate of $71,774. *Id.* The cost per participant was about $145.00. *Id.*

9         Dawn Taylor assisted Belinda Stewart in preparing the memos describing the sign-up

10    process for Passover 2019 with updated dates. Dkt. 79 at ¶ 2, Decl. of Dawn Taylor. However,

11    Dawn Taylor states in her declaration that she was not involved in substantive decisions about

12    the sign-up process in 2019. *Id.*

13         Plaintiff participated in receiving Passover meals during April 2016 and April 2017. Dkt.

14    36 at 2-3; Dkt. 36-1 at 7. In January 2019, Plaintiff tried to sign up for 2019 Passover meals.

15    Dkt. 37-1 at 2, Grievance Investigation Report. Chaplain David Sherman talked to Plaintiff

16    about the sign-up requirements and gave Plaintiff a form. *Id.* at 3, 10. Plaintiff did not meet the

17    criteria of being on the kosher diet or participating in Jewish or Messianic religious programming

18    and tried to sign up under option 3, which required him to explain his desire to participate in

19    Passover. *Id.* at 2, 13. Plaintiff's explanation under option 3 on the sign-up form states

20    "Passover is part of the old testament. As a Christian I may chose [*sic*] to observe these

21    traditions, and wish to do so." Dkt. 49 at 15. Chaplain Sherman requested that Plaintiff rewrite

22    the form to include more information. *Id.* at 2, 3 ("he gave it to Chaplain Sherman and he

23    (Sherman) handed it back to him and was told he had to 'write more.'"). Plaintiff did not return

a rewritten form.  *Id.* at 3 ("I asked [Plaintiff], 'Did you? Did you write more?" He said, 'No, I didn't. . . .'"); Dkt. 49 at 2 ("Specifically, it is accurate that during the grievance investigation, [Plaintiff] told me that he gave his Passover form to Chaplain Sherman, who handed it back to him to write more, and when I asked [Plaintiff] if he wrote more on the Passover sign up form, he replied that he did not but filed the grievance soon after.").

Plaintiff submitted a grievance about being required to meet criteria to participate in Passover meals, and the grievance was assigned Grievance Log I.D. No. 19670835.  Dkt. 37-1 at 2.  The Level I investigation and grievance response was completed by Grievance Coordinator Lee Stemler.  *Id.* at 2-4; Dkt. 49 at 1-2, Decl. of Lee Stemler.  Mr. Stemler's investigation report contains the statements which Plaintiff made to Mr. Stemler about his participation in Passover, and Mr. Stemler states in his declaration that the statements as written in that report are an accurate representation of what Plaintiff said on the day Mr. Stemler interviewed him.  Dkt. 49, at 2.  Plaintiff appealed to Level II, and the Level II grievance investigation was completed by MCC Correctional Program Manager Mark Miller.  Dkt. No. 37-1 at 19, 21.  The Level II response drafted by Mr. Miller was reviewed and signed by MCC Superintendent Jack Warner. *Id.* at 19. Plaintiff appealed the grievance to Level III, where it was investigated by Dawn Taylor. *Id.* at 29-30.  Deputy Director Scott Russell reviewed and signed the Level III response.  *Id.* at 29.  At all three levels of the grievance response, staff agreed Plaintiff had not been wrongfully excluded from the Passover meals since his failure to return a rewritten form with more information seemed to be the reason he had not been allowed to participate.  *Id.* at 2, 19, 29.

At the time of the 2019 Passover meal, Ramadan and Passover had a similar sign-up process.  Dkt. 79 at 2.  Dawn Taylor states in her declaration that in 2019, she and Belinda Stewart visited facilities across the state to listen to the Muslim population regarding Ramadan.

1  *Id.* Ms. Taylor states that it became apparent that the process needed to be revisited, so all

2  restrictions were removed from the sign-up from both Ramadan and Passover for 2020 at that

3  time until it could be reviewed. *Id.* No changes were made to the sign-ups in 2021 due to

4  COVID-19. *Id.* at ¶ 3.

5       Plaintiff signed up for and participated in receiving Passover meals in April 2020. Dkt.

6  36 at 2-3; Dkt. 36-1 at 7.

7       Plaintiff acknowledges in his own declaration that he signed up for and received Passover

8  meals in 2020 and in 2022. Dkt. 86 at 5-7, Decl. of Justin Countryman. He indicates he did not

9  sign up for Passover meals in 2021 because he was in quarantine related to COVID-19 exposure

10  and missed the date to sign up. *Id.* He indicates he did not attempt to sign up late for Passover

11  meals in 2021 because he "did not want to be put through the anxiety, sleepless nights, and

12  mental and emotional distress [he] had suffered back in 2019." *Id.*

13                              <u>DISCUSSION</u>

14  **A.     Relevant Legal Standards**

15       *1.     Summary Judgment*

16       Summary judgment is appropriate when a "movant shows that there is no genuine dispute

17  as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

18  56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party

19  fails to make a sufficient showing on an essential element of his case with respect to which he

20  has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving

21  party bears the initial burden of showing the district court "that there is an absence of evidence to

22  support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden

23  by producing affirmative evidence that negates an essential element of the nonmovant's case, or

by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

2.      *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law.  *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

**B.    Analysis**

1.      *Discovery*

In his response to Defendants' motion for summary judgment Plaintiff argues that Defendants "intentionally obfuscated the discovery process."  Dkt. 87 at 8-9.  Specifically, Plaintiff contends that one discovery request made to Defendant DOC (Production Request No. 3) requested that Defendant:

> Produce all documents, electronically stored information and tangible things showing all (court action) legal or not against the Dept. of Corr. and/or its named facilities, directly in regards to the 2017-18 and 2018-19 Passover memo's policies/procedures preventing incarcerated individuals participation in their entirety, showing each individual case and its resolution.

*Id.*  Plaintiff notes that Defendant initially objected to this request as vague and ambiguous but also stated in the objection that "Plaintiff wants copies of other lawsuits which may have been

brought against the Department." *Id.* Plaintiff contends this issue had subsequently been further discussed by the parties and defense counsel agreed to "look into it" but that "nothing came to fruition." *Id.* Plaintiff argues that defense counsel should have responded further and, specifically, that counsel should have provided citations to *Brennan v. Aston*, 2018 U.S. Dist. Lexis 116450, and *Smith v. Stewart*, 2020 U.S. Dist. Lexis 196606. *Id.*

However, the Court notes that it appears that after initially objecting to this production request Defendants supplemented the response to state that:

> Without waiving the above objections, there are no cases that fit the time period identified (2017-18 Passover sign up memo or 2018-19 Passover signup memo) and the issue identified (cases which challenged the memos preventing incarcerated individual[']s participation, in their entirety). Therefore there are no responsive records to identify.

Dkt. 54; Dkt. 33-1 at 19-20. Plaintiff subsequently moved to compel a further response on the grounds that he "believe[d] [the response] is incorrect." Dkts. 33, 41, 54. The Court denied Plaintiff's motion to compel with respect to Production Request No. 3 directed to Defendant DOC because Plaintiff provided nothing to support this assertion that he believed the response provided was "incorrect." Dkt. 54. The Court concluded that "Plaintiff's unsupported assertion that he believes Defendants are incorrect fails to demonstrate Defendants' response is incomplete or otherwise deficient." *Id.*

Plaintiff does not appear to have filed a further motion with respect to this issue prior to the expiration of the discovery deadline. Moreover, the cases Plaintiff cites do not, in fact, appear to the Court to relate to the DOC's "2017-18 and 2018-19 Passover memo's policies/procedures preventing incarcerated individuals participation in their entirety[.]"[3]

---

[3] The Court notes that one of the cases Plaintiff cites appears to challenge denial of Passover meals at Snohomish County Jail (not a DOC facility), and Plaintiff's claims related to this issue were dismissed based on Plaintiff's failure to exhaust his administrative remedies. *See Brennan v. Aston*, C17-1928, 2018

REPORT AND RECOMMENDATION - 11

1    Accordingly, even if it were appropriate to address this issue at this point, Plaintiff's arguments

2    fail to demonstrate bad faith on the part of Defendants or counsel.[4]

3        2.    *RLUIPA Claim*

4        Defendants argue they are entitled to summary judgment and dismissal of Plaintiff's

5    RLUIPA claim because Plaintiff is only entitled to injunctive relief under RLUIPA and any

6    claims for injunctive relief are now moot.  Dkt. 78.  Specifically, Defendants argue that Plaintiff

7    participated in the 2020 Passover meal, and the policy for Passover sign-up was changed in 2020

8    and 2021, so that there were no required criteria for sign-up.  *See* Dkt. 79 at 2.

9        "In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act

10   (RLUIPA), which provided heightened protection of religious beliefs to prevent undue barriers

11   to religious observances by persons institutionalized in state or federal institutions."  *Brown v.*

12   *Adams*, No. C13-192, 2015 WL 867657, at *3 (E.D. Wash. Feb. 27, 2015).  Under RLUIPA, no

13   government "shall impose a substantial burden on the religious exercise of a person residing or

14   confined to [a jail, prison or other correctional facility] ... even if the burden results from a rule

15   of general applicability," unless the burden furthers a "compelling governmental interest" and is

16   the "least restrictive means of furthering that compelling governmental interest."  42 U.S.C. §

17   2000cc−1(a).

18       Generally, RLUIPA allows for injunctive relief but does not allow for recovery of

19   monetary damages.  *See Sossamon v. Texas*, 563 U.S. 277, 288 (2011) (RLUIPA does not

20

21   U.S. Dist. Lexis 116450 (W.D. Wash. June 14, 2018); *Brennan v. Aston*, 2020 U.S. Dist. Lexis 87232
     (W.D. Wash. April 8, 2020) *report and recommendation adopted* 2020 U.S. Dist. Lexis 86033 (W.D.

22   Wash. May 15, 2020).  The other case Plaintiff cites appears to relate to DOC's refusal to allow Plaintiff
     to switch off of the Passover meal plan back to a regular meal plan.  *See Smith v. Stewart*, C19-05096,

23   2020 U.S. Dist. Lexis 196606 (W.D. Wash. July 29, 2020).

     [4] The Court notes that Plaintiff also does not appear to request any specific relief with respect to his
     allegation of bad faith.  Dkt. 87 at 8-9.

1    provide for claim for monetary damages against the state or state officials sued in their official

2    capacity); *Wood v. Yordy*, 753 F.3d 899, 901 (9th Cir. 2014) (a RLUIPA claim for damages

3    against prison officials in their individual capacities "may not be maintained"); *Holley v. Cal.*

4    *Dep't of Corr.*, 599 F.3d 1108, 1114 (9th Cir. 2010) ("The Eleventh Amendment bars [the

5    plaintiff's] suit for official-capacity damages under RLUIPA.").

6         A federal court's jurisdiction depends on the existence of a live case or controversy.

7    *Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th Cir. 1996).  A case is moot "when it has 'lost its

8    character as a present, live controversy of the kind that must exist if [the court is] to avoid

9    advisory opinions on abstract propositions of law.'"  *Oregon v. FERC*, 636 F.3d 1203, 1206 (9th

10   Cir. 2011) (per curiam) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam)).  If an issue

11   in a case is no longer in dispute, or a party receives the requested relief, then the issue may be

12   moot.  *Alvarez v. Hill*, 667 F.3d 1061, 1063-64 (9th Cir. 2012) ("A claim is moot 'when the

13   issues presented are no longer live or the parties lack a legally cognizable interest in the

14   outcome.'").  Because "[t]he jurisdiction of federal courts depends on the existence of a 'case or

15   controversy' under Article III of the Constitution," we must dismiss a case that has become

16   moot.  *Pub. Util. Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996) (quoting *GTE*

17   *Cal., Inc. v. FCC,* 39 F.3d 940, 945 (9th Cir. 1994)).

18        A court may review a claim that is moot if it implicates a practice that is "capable of

19   repetition yet evading review."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1287

20   (9th Cir. 2013).  In such cases, "there must be a reasonable likelihood that the same party will be

21   subject to the action again,'" and the "'duration of the challenged action or injury must be too

22   short to be fully litigated.'"  *Id.* (quoting *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346,

23   1353 (9th Cir. 1984)).  "Absent a sufficient likelihood that [they] will again be wronged in a

1 similar way, [a plaintiff] is no more entitled to an injunction than any other citizen[.]" *City of*

2 *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

3      Courts have also recognized a "voluntary cessation" exception to the mootness doctrine

4 wherein a "defendant cannot automatically moot a case simply by ending its unlawful conduct

5 once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Courts have explained that

6 "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because

7 a dismissal for mootness would permit a resumption of the challenged conduct as soon as the

8 case is dismissed." *Knox v. Serv. Employees Int'l Union*, 567 U.S. 298, 307 (2012). However,

9 for this exception to apply, "voluntary cessation must have arisen *because of* the litigation."

10 *Pub. Utilities Comm'n of State of Cal..*, 100 F.3d at 1460 (emphasis in original); *Hamidi v. Serv.*

11 *Emps. Int'l Union Loc. 1000*, No. C14-319, 386 F. Supp. 3d 1289, 1295–96 (E.D. Cal. June 18,

12 2019), *aff'd*, 2021 WL 4958855 (9th Cir. Oct. 26, 2021). "[A] defendant claiming that its

13 voluntary compliance moots a case bears the formidable burden of showing that it is absolutely

14 clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the*

15 *Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000).

16      The Court first notes that Plaintiff's second amended complaint does not appear to seek

17 any specific injunctive relief but, instead, seeks only monetary damages and "such other and

18 further relief as the Court deems just an[d] proper." Dkt. 68. Because Plaintiff does not appear

19 to seek specific injunctive relief in his second amended complaint, [5] and he cannot recover

20 monetary damages under RLUIPA, his RLUIPA claim should be dismissed.

21

22   [5] Plaintiff argues for the first time in his response to the motion for summary judgment that he is entitled to injunctive relief because Defendants are "blatant[ly] disregard[ing]" several past court decisions. *See*
23 Dkt. 87 at 11. But Plaintiff's requests and arguments that he is entitled to some form of injunctive relief are not included in his second amended complaint but are submitted for the first time in his response to the motion for summary judgment. *See Madrid v. Atkins*, C19-1710-JLR-TLF, 2020 WL 7029853 (Nov.

However, even if Plaintiff's second amended complaint could be construed to seek injunctive relief based upon the generalized arguments raised for the first time in response to Defendants' motion for summary judgment, any such claims are moot. Plaintiff acknowledges that he was permitted to sign up for Passover in 2020 and 2022 and that he responded to the question on the form regarding his desire to participate in Passover in the same way he had in 2019. Dkt. 86 at 6-7. In addition, Defendants present evidence that in 2020, the DOC policy for prisoners requesting Passover meals was changed so that *no* criteria were required to be met in order to sign up. *See* Dkt. 79 at 2. Plaintiff appears to argue that because the sign-up form itself asked for the inmate to explain why they wished to participate in Passover, that the Chaplain still had discretion to deny requests to participate in Passover based on the response. But Plaintiff presents no evidence that the Chaplain retained such discretion despite the Defendants' presentation of evidence that there were in fact no criteria required for sign-up. Plaintiff also presents no evidence that Defendants denied his or anyone's request to sign up for Passover after the 2020 policy change, or that Defendants enforced any criteria from 2020 to 2022 that imposed a substantial burden upon any prisoner's religious exercise. Defendants also present evidence the policy remained the same from 2020 to 2021, and the record appears to reflect, and Plaintiff

---

13, 2020) (Generally, "[a] party cannot assert unpled theories and claims for the first time in response to a motion for summary judgment." (citing *Navajo Nation v. United States Forest Servs.*, 535 F.3d 1058, 1080 (9th Cir. 2008) and *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006)). Moreover, none of the cases cited by Plaintiff in his response brief appear to address the precise issue presented in this case, and Plaintiff fails to explain or demonstrate, nor can the Court discern, how these cases support his argument, discussed below, that, despite the change in the Passover sign-up policy in 2020, he remains entitled to injunctive relief in this case.

does not dispute, that the policy also remained the same in 2022.[6]  *See* Dkt. 86 at 6; Dkt. 87 at 269.

To the extent Plaintiff argues the requirement that he sign up for Passover meals at all, or the fact that the sign-up form itself asks the Plaintiff to explain why Passover is important to him, violates RLUIPA, the Court finds that Plaintiff fails to raise an issue of fact as to whether these requirements imposed a substantial burden upon Plaintiff's religious exercise.  Defendants present evidence that under the current policy inmates are not in fact required to meet *any* criteria in order to sign-up for Passover.  As noted, Plaintiff presents no evidence to refute this, that Defendants denied anyone's request to sign up for Passover, or that they enforced any criteria that imposed a substantial burden upon any prisoner's religious exercise.  The mere fact that the sign-up form asked the inmate to explain why they wanted to participate in Passover does not impose a substantial burden given that Defendants' present evidence that the inmates did not have to meet any criteria to sign up, indicating this question was purely informational.  *See, e.g., Resnick v. Adams*, 348 F.3d 763, 767-72 & n.6 (9th Cir. 2003) (requiring inmates to submit standardized form application with a "written statement articulating the religious motivation for" requesting accommodation for religious dietary needs (specifically a kosher diet) is not a "substantial' burden" on religious exercise under RLUIPA).[7]  Further, as noted above, Plaintiff

---

[6] The Court notes that Defendants do not appear to specifically address the status of the policy in 2022 because their motion was filed prior to the commencement of Passover in 2022.  However, Plaintiff does not assert that any changes were made in 2022, the memo and sign-up sheet for Passover 2022 appears to be substantially the same as in 2020, with the exception that the 2020 sign-up sheet also asked the applicant to provide information as to whether they had participated in the majority of Jewish, Messianic, or Christian religious programming over the past 6 months.  Dkt. 87 at 269-272.  Plaintiff also acknowledges he was permitted to sign up in 2020 and 2022, and that he provided the same explanation for his desire to participate as he had in 2019.  Dkt. 86 at 6-7.

[7] *See also El-Shaddai v. Stainer*, No. C14-9313, 2016 WL 7261230, at *19 (C.D. Cal. Dec. 13, 2016), *judgment entered*, No. C14-9313, 2016 WL 7327768 (C.D. Cal. Dec. 13, 2016), and *aff'd sub nom. Wilkerson v. Stainer*, 704 F. App'x 689 (9th Cir. 2017); *Jackson–Bey v. Hanslmaier*, 115 F.3d 1091,

1    also acknowledges that he was permitted to sign up for Passover in 2020 and 2022 and that he

2    responded to the question on the form regarding his desire to participate in Passover in the same

3    way he had in 2019.

4         Thus, it appears that to the extent Plaintiff does seek injunctive relief based upon an

5    alleged violation of RLUIPA, his request is now moot due to the change in DOC policy.

6         Furthermore, Plaintiff fails to show that he meets the narrow exception to the mootness

7    doctrine for claims capable of repetition yet evading review.  *See Lyons*, 461 U.S. at 109.

8    Plaintiff asserts that his claim is not moot because Defendants may reinstate the former policy in

9    the future.  Dkt. 87 at 10.  But this speculation is not sufficient to show a "reasonable

10   expectation" that Plaintiff will be denied a Passover meal in the future or that the DOC will

11   reinstate the prior policy.  Nor has Plaintiff shown that his past injury is of the type "inherently

12   limited in duration such that it is likely always to become moot before federal court litigation is

13   completed."  *See Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1509-10 (9th Cir. 1994).

14        Finally, Plaintiff fails to show he meets the "voluntary cessation" exception to mootness.

15   Defendants present evidence, which Plaintiff does not appear to dispute, that the change to the

16   policy was not because of Plaintiff's litigation but rather was based upon responses received

17   from the Muslim population in facilities across the state regarding a similar sign-up process for

18   Ramadan.  Dkt. 79.  Defendants present evidence that, based upon these responses, it became

19   apparent that the sign-up process needed to be revisited and so all restrictions were removed

20   from the sign-up for both Ramadan and Passover in 2020.  *Id.*  Furthermore, Defendants'

21

22   1097 (2d Cir. 1997) ("Registration puts the institution on notice that certain religious accommodations
23   will likely be sought and thereby provides the institution with time to consider if and how to implement
     them.... In short, registration places, at most, a slight burden on an inmate's right to religious freedom
     while serving as an important and beneficial 'bright line' that enables prison officials to ascertain the
     seriousness of the inmate's religious commitment and respond accordingly.").

Passover meal sign-up memorandums from 2020 and 2022, submitted by Plaintiff, acknowledge that:

> Passover (or Pesach) is celebrated primarily by Jewish, Messianic Jewish, and some Christian faiths. … Christianity similarly recognizes Passover as the redemption from the bondage of sin through the sacrifice of Christ.  Thus, while Passover commemorates the exodus from Egypt, it also marks the zenith of God's promise to bring a redeemer through whom one might be free from the penalty of sin.

Dkt. 87 at 269-272.  Based upon this acknowledgment in the policy, it does not appear that the challenged 2019 policy can reasonably be expected to recur.

Accordingly, the Court should find Plaintiff's RLUIPA claim is moot, Defendants' motion for summary judgment should be granted with respect to this claim, and Plaintiff's RLUIPA claim should be dismissed.[8]

### 3.    Section 1983 Claims

Plaintiff also brings several claims under 42 U.S.C. § 1983.

#### a)    Claims against DOC

Plaintiff names the DOC as a Defendant.  Defendants move for summary judgment arguing the DOC is not a proper defendant in this action.  Dkt. 78.  The DOC, an agency of the

---

[8] The Court notes that RLUIPA also contains a "safe harbor provision" that functions as a statutory mootness provision. It states,

> A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

42 U.S.C. § 2000cc-3 (e).

District courts have generally construed this provision "according to its plain meaning."  *Forter v. Geer*, No. C10-06065, 868 F. Supp. 2d 1091, 1098 (D. Or. 2012), *aff'd*, 536 F. App'x 724 (9th Cir. 2013); *see also Monson v. Steward*, No. C15-00513, 2017 WL 2882709, at *6 (D. Or. July 6, 2017) (unpublished); *Bilal v. Lehman*, No. C04-2507-JLR, 2006 WL 3626808, at *4 (W.D. Wash. 2006) (holding that decision to provide a Muslim inmate with halal meals eliminated substantial burden on his religious exercise and mooted RLUIPA claim).  Thus, in addition to the constitutional mootness doctrine discussed above, it appears that this statutory provision would also moot Plaintiff's RLUIPA claim.

REPORT AND RECOMMENDATION - 18

1    State of Washington, is not a "person" for purposes of a § 1983 civil rights action, nor is the

2    State of Washington itself.  *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 65, 71

3    (1989); *Maldonado v. Harris*, 370 F.3d 945, 951 (9th Cir. 2004).  Thus, the DOC cannot be sued

4    under § 1983.  Additionally, the Eleventh Amendment bars suits against state agencies, and those

5    in which the state itself is named as a defendant.  *See P.R. Aqueduct & Sewer Auth. v. Metcalf &*

6    *Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1040

7    (9th Cir. 2003).  The Court notes that there is no evidence the State of Washington has waived its

8    Eleventh Amendment immunity in federal courts.

9        Accordingly, Defendants' motion for summary judgment should be granted with respect

10   to Plaintiff's § 1983 claims brought against Defendant DOC and those claims should be

11   dismissed with prejudice.

12            b)    *Official Capacity Claims for Damages*

13       Defendants also move for summary judgment dismissing Plaintiff's official capacity

14   claims for damages.  Dkt. 78.  The Eleventh Amendment bars claims for damages against state

15   officials acting in their official capacity.  *Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir.

16   2016).

17       Accordingly, Defendants' motion for summary judgment should be granted with respect

18   to Plaintiff's § 1983 claims for damages brought against Defendants in their official capacities

19   and those claims should be dismissed with prejudice.

20            c)    *Lack of Personal Participation*

21       Defendants also move for summary judgment seeking dismissal of all claims against

22   Defendants Warner, Miller, Russell, and Taylor on the grounds that Plaintiff fails to show they

23   personally participated in the alleged constitutional violations.  Dkt. 78.  Plaintiff alleges that

Defendants Warner, Miller, Russell, and Taylor are liable because they participated in creating

and implementing the policy and investigated or denied his grievances related to the policy. Dkt.

68.

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show: (1) he suffered a

violation of rights protected by the Constitution or created by federal statute, and (2) the

violation was proximately caused by a person acting under color of state law. *See Crumpton*,

947 F.2d at 1420. The first step in a § 1983 claim is therefore to identify the specific

constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To satisfy

the second prong, a plaintiff must show the individually named defendant caused, or personally

participated in causing, the alleged harm. *See Leer*, 844 F.2d at 633; *Arnold v. Int'l Bus. Machs.

Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). As such, in a § 1983 action, "supervisory officials

are not liable for actions of subordinates on any theory of vicarious liability." *Hansen v. Black*,

885 F.2d 642, 645-46 (9th Cir. 1989) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479

(1986)). Rather, a supervisor may only be liable "if there exists either (1) his or her personal

involvement in the constitutional deprivation, or (2) a sufficient causal connection between the

supervisor's wrongful conduct and the constitutional violation." *Id.* at 646 (citation omitted).

Such liability can be imposed, for instance, if the supervisor knew or reasonably should have

known his subordinates would cause constitutional injury, or if his own conduct showed reckless

indifference to the rights of others. *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011) (internal

citations and quotation marks omitted); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

(a supervisor is only liable for his subordinates' constitutional violations if he "participated in or

directed the violations, or knew of the violations and failed to act to prevent them").

Prisoners do not have a stand-alone due process right related to the administrative grievance process. *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (holding there is no liberty interest entitling prisoners to a specific grievance process). "Because there is no right to any particular grievance process, it is impossible for due process to have been violated by ignoring or failing to properly process grievances." *Grigsby v. Hubert*, No. C09-1067, 2009 WL 1861172, *1 (E.D. Cal. June 29, 2009).

Moreover, in general, "[i]n order to be liable under § 1983 a prison official must have done something more than fail to correct an alleged violation brought to their attention in a grievance after the violation has occurred." *Hardney v. Moncus*, No. C15-1842, 2016 WL 7474908, at *6 (E.D. Cal. Dec. 28, 2016) (citing *Taylor*, 880 F.2d at 1045 (upholding dismissal of defendant when plaintiff failed to provide facts showing defendant knew of and failed to prevent constitutional violations)); *Anaya v. CDCR*, No. C16-00040, 2016 WL 7178527, at *5 (E.D. Cal. Dec. 8, 2016) ("[T]he denial of a prisoner's administrative appeal generally does not cause or contribute to the underlying violation." (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)). And "merely denying a grievance without some decision-making authority or ability to resolve the underlying issue grieved is not enough to establish personal participation." *Mack v. Aranas*, No. C17-02239, 2021 WL 1535331, at *3 (D. Nev. Apr. 16, 2021); *see Stewart v. Warner*, No. C15-5243-RBL-KLS, 2016 WL 1104893, at *5 (W.D. Wash. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 1089974 (W.D. Wash. Mar. 21, 2016) (holding that nurses who had reviewed and denied the plaintiff's grievances did not personally participate in alleged Eighth Amendment violations because they did not have decision-making authority over the plaintiff's care); *May v. Williams*, No. C10-00576, 2012 WL 1155390, at *3-4

(D. Nev. Apr. 4, 2012) (finding that merely denying grievances is not enough to establish a constitutional claim).

Here, Defendants argue that with respect to Defendants Warner, Miller, Russell and Taylor, Defendants' only participation in the events giving rise to Plaintiff's claims was in their supervisory role of drafting or signing off on Plaintiff's grievance appeals. Dkt. 78 at 10. As discussed above, allegations regarding the handling of Plaintiff's grievances do not state a claim under section 1983 because the denial of a grievance does not in and of itself rise to the level of a constitutional violation. Thus, to the extent Plaintiff asserts Defendants are liable simply because they participated in the handling of his grievances, he cannot state a claim upon which relief can be granted. Further, to the extent Plaintiff alleges Defendants should be held liable based solely upon their supervisory positions, his claim fails as Defendants cannot be held liable under a theory of vicarious liability.

Moreover, Plaintiff's allegation that Defendants violated his rights by failing to correct the alleged constitutional violations that had already occurred by not permitting him to sign up for Passover when he brought it to their attention through the grievance process is not sufficient, on its own, to show Defendants personally participated in the underlying alleged violation. Merely denying a grievance without some decision-making authority or ability to resolve the underlying issue grieved is not enough to establish personal participation. Here, Plaintiff asserts no facts and points to no evidence demonstrating that Defendants Warner and Miller (who were employees or officials at MCC not at DOC headquarters) had decision-making authority to change DOC policy related to the Passover meal sign-up process.

Defendants also present evidence that Defendant Taylor, although working on behalf of DOC headquarters, did not personally participate in the alleged constitutional violations.

1    Specifically, Defendants present evidence that Defendant Taylor's only involvement in the 2019

2    Passover sign-up process was to update the memos from the 2018 Passover sign-up to be used

3    for 2019 Passover as instructed by Defendant Stewart.  Dkt. 79.  Defendant Taylor states in her

4    declaration that the memos were each signed with "BDS:BK:dt" which reflected that she had

5    updated the memos on behalf of Defendants Belinda Stewart and Brian King, but she states that

6    she was not a decision-maker at the time and was only learning/assisting Defendant Stewart with

7    this process.  *Id.*  Plaintiff presents no evidence to contradict Defendant Taylor's declaration.

8        Plaintiff also makes some generalized and conclusory assertions that Defendants Warner,

9    Miller, and Russell were somehow involved in creating and implementing the 2019 Passover

10   sign-up policy.  Dkt. 68.  But Plaintiff offers no facts and points to no evidence to support these

11   conclusory assertions and such assertions are insufficient, without more, to demonstrate personal

12   participation.  *See Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982)

13   ("Vague and conclusory allegations of official participation in civil rights violations are not

14   sufficient[.]").

15       Accordingly, Defendants' motion for summary judgment should be granted with respect to

16   Plaintiff's individual capacity § 1983 claims against Defendants Warner, Miller, Russell and

17   Taylor, under the First Amendment Free Exercise Clause, the Eighth Amendment, the

18   Fourteenth Amendment Due Process Clause, and Plaintiff's Fourteenth Amendment Equal

19   Protection claim alleging intentional discrimination based on membership in a protected class,

20   and those claims should be dismissed with prejudice.  Even if Plaintiff could show personal

21   participation of these Defendants in the alleged federal constitutional violations, the Court also

22   recommends summary judgment and dismissal of these claims against these and the remaining

23   Defendants, for the reasons discussed below.

1

2              d)        First Amendment Free Exercise of Religion Claim

3        In order to implicate the First Amendment's Free Exercise Clause, an inmate's belief

must be religious in nature and sincerely held.  *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir.

4    1994) (internal quotations and citation omitted); *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th

5    Cir. 2008).  Inmates with such beliefs have "[t]he right to exercise [their] religious practices and

6    beliefs...." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citing *O'Lone v.*

7    *Shabazz*, 482 U.S. 342, 348 (1987).  Courts have "reject[ed] the notion that to claim the

8    protection of the Free Exercise Clause, one must be responding to the commands of a particular

9    religious organization." *Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989).

10       However, a mere inconvenience on religious exercise does not give rise to a

11   constitutional violation; the burden imposed must be substantial.  *Freeman v. Arpaio*, 125 F.3d

12   732, 737 (9th Cir. 1997), *overruled on other grounds as recognized in Penwell v. Holtgeerts*, 386

13   F. App'x 665, 667 (9th Cir. 2010) (unpublished); *Jones v. Williams*, 791 F.3d 1023, 1031-32 (9th

14   Cir. 2015).  To be considered a "substantial burden," the challenged state action must "place

15   more than an inconvenience on religious exercise; it must have a tendency to coerce individuals

16   into acting contrary to their religious beliefs or exert substantial pressure on an adherent to

17   modify his behavior and to violate his beliefs." *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir.

18   2013) (quoting *Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th

19   Cir.2006) (internal quotation marks and alterations omitted)).

20       Further, while the First Amendment guarantees the right to the free exercise of religion,

21   this right "is necessarily limited by the fact of incarceration, and may be curtailed in order to

22   achieve legitimate correctional goals or to maintain prison security." *McElyea*, 833 F.2d at 197

23   (citing *O'Lone*, 482 U.S. at 348).  Thus, if the challenged state action imposes a substantial

burden on a plaintiff's religious exercise, the next step is to evaluate whether that state action "is

reasonably related to legitimate penological interests," using a four-factor test under *Turner v.*

*Safely*, 482 U.S. 78, 89-90 (1987). *Shakur*, 514 F.3d at 884 (citing *Turner*, 482 U.S. at 89-90).

In making this determination, the Court considers the following factors:

> (1) Whether there is a "'valid, rational connection' between the prison regulation
> and the legitimate governmental interest put forward to justify it";
> (2) Whether there are "alternative means of exercising the right that remain open
> to prison inmates";
> (3) Whether "accommodation of the asserted constitutional right" will "impact ...
> guards and other inmates, and on the allocation of prison resources generally"; and
> (4) Whether there is an "absence of ready alternatives" versus the "existence of
> obvious, easy alternatives."

*Shakur*, 514 F.3d at 884 (9th Cir. 2008) (quoting *Turner*, 482 U.S. at 89–90). If, under the

*Turner* factors, the state's action is found to be reasonably related to a legitimate penological

objective, no First Amendment violation will be found.

Although somewhat unclear, Plaintiff's second amended complaint appears to raise both

a facial and an as-applied challenge to the 2019 Passover policy. Generally, a facial challenge to

a regulation requires the plaintiff to show "that no set of circumstances exists under which [the

regulation] would be valid[,] ... that the [regulation] lacks any plainly legitimate sweep … [or

that] a substantial number of its applications are unconstitutional, judged in relation to the

statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472-73 (2010)

(internal quotation marks and citations omitted); *see also Jones v. Sinclair*, 2014 WL 8849985, at

*6-7 (W.D. Wash. Nov. 18, 2014) (applying *Stevens* to a DOC Policy). On the other hand, an

"as-applied" claim "challenges only one of the rules in a statute, a subset of the statute's

applications, or the application of the statute to a specific factual circumstance[.]" *Hoye v. City*

*of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (citations omitted). The Ninth Circuit has held

1    that the difference between as-applied and facial challenges "lies only in whether all or only

2    some ... subrules (or fact-specific applications) are being challenged, the substantive legal tests

3    used in the two challenges are 'invariant.'" *Id.* (internal citation omitted).

4          Here, to the extent Plaintiff raises a facial challenge to the 2019 Passover policy, the

5    Court finds that Plaintiff fails to create a genuine dispute of material fact as to whether the

6    policy, on its face, imposed a substantial burden on his religious practice.  The Ninth Circuit has

7    determined that a prison may, consistent with the constitution, require inmates to proceed

8    through an application process in order to receive a religious diet.  *Resnick*, 348 F.3d at 768.  The

9    Court in *Resnick* considered the *Turner* factors and determined that requiring an inmate to

10   complete a standardized written application to receive a religious diet did not unreasonably

11   burden the inmate's right to free exercise of religion.  *Id.* at 770–71.  Other courts have also held

12   that "registration places, at most, a slight burden on an inmate's right to religious freedom while

13   serving as an important and beneficial 'bright line' that enables prison officials to ascertain the

14   seriousness of the inmate's religious commitment and respond accordingly." *Jackson-Bey*, 115

15   F.3d at 1097.  Furthermore, the policy here provided for an option under which prisoners who

16   did not meet the first two criteria of either being a current kosher meal participant or being a non-

17   kosher meal participant with demonstrated participation in Jewish, Messianic, or religious

18   programming applicable to the Jewish faith over the past six months, could still qualify by

19   providing an explanation as to why they wished to participate in Passover.  Plaintiff does not

20   appear to allege and points to nothing in the record to indicate that "no set of circumstances

21   exists under which [the regulation] would be valid[,] ... that the [regulation] lacks any plainly

22   legitimate sweep … [or that] a substantial number of its applications are unconstitutional, judged

23   in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 472-73.  Accordingly,

the Court should grant summary judgment with respect to Plaintiff's facial challenge to the 2019 Passover policy on First Amendment Free Exercise grounds and dismiss these claims with prejudice.

Turning to Plaintiff's as-applied challenge, the Court finds that a genuine dispute of material fact remains as to whether the 2019 Passover policy, as applied to Plaintiff, substantially burdened his religious practice. Specifically, Plaintiff alleges that Defendant Sherman told him his explanation that Passover is part of the Old Testament and as a Christian he may choose to observe these traditions, was insufficient and that he "had to write more." Dkt. 86 at 3-4. Defendants argue that Plaintiff could have simply rewritten his explanation and that requiring a rewrite did not impose a substantial burden. But Plaintiff presents evidence that upon further explaining himself verbally to Defendant Sherman regarding the sincerity of his religious belief in celebrating Passover as a Christian, he could not understand what other information Defendant Sherman wanted included and that it was clear nothing he could think of to write by way of further explanation would be sufficient and resubmitting the form would be futile, thus he filed a grievance instead. Dkt. 86 at 3-4.

The Court notes that the record does not contain any definitive evidence regarding how common it is for Christians to practice Passover, or whether such practice is generally limited only to specific sections or denominations of Christianity. However, the Court notes that in 2017, the DOC Passover sign-up memo provided that:

> [t]his year preference will be given to kosher meal participants and non-kosher meal participants who have participated in Jewish, Messianic, *Christian* or religious programming applicable to the Jewish faith over the past twelve (12) months. Those who do not meet these requirements will be approved or denied at the discretion of the facility Chaplain.

1    Dkt. 87 at 235 (emphasis added).  However, in 2018 and 2019, the specific provision for

2    Christianity was removed from the memo to provide that:

3         In order to manage our limited resources participation will be identified in the
          following ways:
4         1. Current kosher meal participants: Inmates who are currently on a kosher diet
          are eligible to participate.
5         2. Inmates with demonstrated participation in Jewish or Messianic religious
          programming applicable to the Jewish faith over the past six (6) months.
6         3. Inmates who do not meet the criteria above – written explanation requests: If
          you are not currently on a kosher diet or did not participate in Jewish or Messianic
7         religious programming, you may provide a written explanation on the back of
          your meal request form as to why you should be allowed to participate in
8         Passover. Those who apply through criteria 3 will be approved or denied at the
          discretion of the facility Chaplain.

9
     But in 2020, the Passover meal sign-up memo was revised again to acknowledge that:
10
          Passover (or Pesach) is celebrated primarily by Jewish, Messianic Jewish, and
11        *some Christian faiths. … Christianity similarly recognizes Passover as the
          redemption from the bondage of sin through the sacrifice of Christ.  Thus, while
12        Passover commemorates the exodus from Egypt, it also marks the zenith of God's
          promise to bring a redeemer through whom one might be free from the penalty of
13        sin.*

14   Dkt. 87 at 269-72 (emphasis added).  The Court finds that, on this record, a genuine issue of

15   material fact exists as to whether the 2019 Passover policy, as applied to Plaintiff, substantially

16   burdened his religious exercise.

17        Accordingly, the Court will consider the *Turner* factors to determine whether the state's

18   action is reasonably related to legitimate penological interests.  The first *Turner* factor requires

19   the Court to consider whether there is a valid, rational connection between the policy and the

20   legitimate governmental interest put forward to justify it.  Defendants assert that the 2019

21   Passover policy was reasonably related to the legitimate penological interest in ensuring that

22   Passover meals are provided to those who observe Passover while helping the DOC to moderate

23   food costs.  Dkt. 78 at 14.  The state has a legitimate governmental interest in reducing the costs

1    of Passover meals while still providing them to individuals who hold a sincerely held religious

2    belief requiring their participation in Passover.  *See Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir.

3    1993) (Holding the state has "a legitimate interest in running a simplified food service, rather

4    than one that gives rise to many administrative difficulties … [and] whether the culinary policy

5    is reasonable requires a balancing of the degree of intrusiveness into the right of free exercise

6    against the costs of accommodation, giving appropriate deference to prison officials' assessment

7    of the costs."); *see also Resnick*, 348 F.3d at 769 (holding that "orderly administration of a

8    program that allows federal prisons to accommodate the religious dietary needs of thousands of

9    prisoners" is a "legitimate governmental interest"); *Piatnitsky v. Stewart*, C17-05486-BHS-TLF,

10   2019 WL 2233342, at *17 (W.D. Wash. Feb. 27, 2019) ("[T]he state's interest in reducing costs

11   of Passover meals while still providing them to people who practice Judaism is a legitimate

12   governmental interest."); *Shakur*, 514 F.3d at 886 ("the reduction of administrative and

13   budgetary burdens" may constitute legitimate penological interests).

14          Here, Defendants do present some evidence which tends to indicate that it cost the DOC

15   more to provide Passover meals than it did to provide regular meals during the relevant period.

16   However, Defendants do not provide a direct comparison for the cost per meal for regular meals

17   versus Passover meals and thus it is difficult to assess the precise economic impact of providing

18   Passover meals.  Defendants also present evidence that a larger number of inmates participated

19   in Passover meals when there were no criteria attached to participation.  Specifically, when there

20   were no criteria in 2016 1,838 inmates participated, when criteria were instituted beginning in

21   2017, 561 inmates participated, in 2018, 498 inmates participated, and in 2019, 495 inmates

22   participated.  Defendant Stewart presents evidence that prior to 2017, there was no criteria for

23   inmate approval for Passover meal participation and that "[a]fter a review, it was determined the

1    Department was spending a large amount of resources preparing meals for inmates participating

2    in Passover which it could no longer maintain, with the thought that the Department was likely

3    now providing Passover meals to inmates who wanted them out of curiosity and not for a

4    religious purpose, due to the large increase in meals." Dkt. 38 at 2.

5        The Court finds that while Defendants may have submitted sufficient evidence that the

6    2019 Passover policy on its face was reasonably related to the legitimate penological interest in

7    ensuring that Passover meals are provided to those who observe Passover while helping the DOC

8    to moderate food costs, Defendants have not sufficiently shown a rational connection between

9    the DOC's interest and the criteria it instituted for Passover meals as those criteria were applied

10   specifically to Plaintiff.  As discussed above, Plaintiff presents evidence that he submitted the

11   explanation, under option #3, that "Passover is part of the old testament.  As a Christian I may

12   chose [*sic*] to observe these traditions, and wish to do so."  Dkt. 49 at 15.  Plaintiff states he was

13   told by Defendant Sherman in response to this explanation that "meals are expensive so you need

14   to write more."  *Id.*; Dkt. 86 at 3-4.  Plaintiff indicates that based on his discussion with

15   Defendant Sherman, he could not understand what other information must be included, that it

16   was clear nothing he could think of to write by way of explanation would be sufficient, and that

17   therefore resubmitting the form would be futile.  *Id.*  The record does not contain any definitive

18   evidence regarding how common it is for Christians to participate in Passover, or whether such

19   practice is generally limited only to specific sections or denominations of Christianity, nor do

20   Defendants provide any evidence regarding what would have been a sufficient response for a

21   Christian seeking to participate in Passover.  The Court also notes that in the 2020 and 2022

22   Passover sign-up memos, the DOC explicitly acknowledged that:

23           Passover (or Pesach) is celebrated primarily by Jewish, Messianic Jewish, and
             some Christian faiths. … Christianity similarly recognizes Passover as the

REPORT AND RECOMMENDATION - 30

redemption from the bondage of sin through the sacrifice of Christ.  Thus, while Passover commemorates the exodus from Egypt, it also marks the zenith of God's promise to bring a redeemer through whom one might be free from the penalty of sin.

Defendants also present no evidence regarding what the additional cost would have been if they had accepted an explanation such as that provided by Plaintiff.

Moreover, Plaintiff has put forth evidence that his family was also willing to pay the cost of his Passover meals if the DOC would not.  Plaintiff indicates he informed Defendant Sherman of this fact during their discussion and Defendant Sherman rejected this proposal.  Defendants do not adequately address this issue and have not presented any evidence that allowing Plaintiff's family to pay for his Passover meals would have undermined their interest in reducing the costs of providing Passover meals while running an orderly food service.  *See Piatnitsky*, 2019 WL 2233342 (finding an issue of fact under the first *Turner* factor where Plaintiff put forth evidence his family was willing to pay for his Passover meals and Defendants failed to adequately address this issue and where Defendants failed to show a rational connection between their interest in reducing costs and the criteria instituted for Passover meals as those criteria were applied specifically to plaintiff).

The Court finds that, on this record, a genuine issue of material fact exists as to whether the there is a valid, rational connection between the 2019 Passover policy, as applied to Plaintiff, and the legitimate governmental interest put forward to justify it, namely, the interest in reducing the costs of Passover meals while still providing them to individuals who have a sincerely held religious belief requiring their participation in Passover meals.

The second *Turner* factor requires the Court to consider whether Plaintiff has alternative means by which he can practice his religion.  "The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that

1    he or she claims is being affected; rather, we are to determine whether the inmates have been

2    denied all means of religious expression." *Ward*, 1 F.3d at 877–78 (citing *O'Lone*, 482 U.S. at

3    351–52). As the Ninth Circuit noted in *Ward*,

> [i]n other cases, courts have found that although some aspects of religious
> practice were impinged upon, claimants retained the ability to participate in other
> significant rituals and ceremonies of their faith. For example, although the
> Muslim claimants in *O'Lone* were denied the opportunity to attend Jumu'ah, the
> Muslim weekly religious service, they had the virtually unlimited right to
> congregate for prayer and discussion outside of working hours. Moreover, the
> Muslim prisoners had free access to an imam, a Muslim prayer leader, whom the
> state provided. Muslim prisoners were given special meals, and special
> arrangements were made during the month-long observation of Ramadan, a
> period of fasting and prayer, to allow them to take their meals at the religiously
> prescribed times.

10    *Id.* Here, Plaintiff does not argue that he was prevented from engaging in other forms of

11    religious expression related to Christianity. Rather, Plaintiff appears to acknowledge that he did

12    regularly participate in Christian religious programming at MCC. *See* Dkt. 87 at 5.

13    Accordingly, the Court finds that this factor weighs in favor of Defendants.

14        The third *Turner* factor requires the Court to consider the impact accommodating the

15    asserted constitutional right will have on prison guards, other inmates and the allocation of

16    prison resources generally. As discussed above with respect to the first *Turner* factor,

17    Defendants do not adequately address the impact of accommodating the asserted constitutional

18    right as applied to Plaintiff. In *Shakur*, the Ninth Circuit found that the institutional defendant

19    had failed to investigate how much it would cost to provide Muslim inmates with kosher meals,

20    and that "there is no indication that other Muslim prisoners would demand kosher meals if

21    [Plaintiff's] request were granted." *Shakur*, 514 F.3d at 887. Here, Defendants present no

22    evidence regarding what the additional cost would have been if they had accepted an explanation

23    such as that provided by Plaintiff, namely that he was a practicing Christian, Passover was part

of the Old Testament and that he wished to participate on that basis.  *See Vincent v. Stewart*, 757

Fed. App'x. 578 (9th Cir. 2018) ("[D]efendants' allegations that accommodating [Plaintiff]

would require significant additional labor, time, and staff are conclusory and do not indicate that

the defendants actually looked into providing [Plaintiff] and other similarly situated inmates with

religiously compliant metabolic meals. ... Thus, the defendants' allegations were inadequate to

satisfy the third and fourth *Turner* factors, and summary judgment was inappropriate.").

Moreover, Plaintiff has put forth evidence that his family was willing to pay the cost of his

Passover meals.  Defendants do not adequately address this issue and have not presented any

evidence that allowing Plaintiff's family to pay for his Passover meals would have had a

significant negative impact on prison guards, other inmates and the allocation of prison resources

generally.  The Court finds that, on this record, a genuine issue of material fact exists as to the

impact of accommodating the asserted constitutional right on prison guards, other inmates and

the allocation of prison resources generally.

       The fourth *Turner* factor requires the Court to consider whether "there are ready

alternatives to the prison's current policy that would accommodate [Plaintiff] at de minimis cost

to the prison."  *Ward*, 1 F.3d at 879.  The "existence of obvious, easy alternatives may be

evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison

concerns."  *Turner*, 482 U.S. at 90.  Again, as discussed above, Defendants present no evidence

regarding what the additional cost would have been if they had accepted an explanation such as

that provided by Plaintiff and Plaintiff has put forth evidence that his family was willing to pay

the cost of his Passover meals which Defendants have not adequately addressed.  The Court finds

that, on this record, a genuine issue of material fact exists as to the existence of obvious, easy

alternatives and whether the policy as applied to Plaintiff was an exaggerated response to the prison's concerns.

In sum, in considering Plaintiff's First Amendment Free Exercise as-applied challenge to the 2019 Passover sign-up policy, the Court finds that genuine issues of material fact remain as to three of the four *Turner* factors.  Therefore, the Court concludes that questions of fact preclude summary judgment as to Plaintiff's as-applied First Amendment Free Exercise claim.  Accordingly, the Court should deny summary judgment on the issue of whether the 2019 Passover sign-up policy, as applied to Plaintiff, violated his First Amendment constitutional right to the free exercise of his religion.  While Defendants do not specifically argue lack of personal participation by Defendants Stewart and King in application of the 2019 Passover sign-up policy to Plaintiff, under the Court's analysis of Plaintiff's as-applied challenge to that policy, the only individual the record indicates was personally involved in the alleged unconstitutional *application* of the policy is Defendant Sherman.  Accordingly, Plaintiff's as-applied First Amendment Free Exercise claim should proceed with respect to Defendant Sherman only.  However, as addressed below, the Court finds that summary judgment should be awarded with respect to this claim on qualified immunity grounds.

e)      *Other First Amendment Claims*

In his second amended complaint Plaintiff also makes the conclusory assertion that Defendants violated his First Amendment rights under the Establishment Clause, Freedom of Expression Clause, Freedom of Speech Clause, and Right of Expressive Association Clause.  Dkt. 68.  However, Plaintiff's second amended complaint provides specific facts and arguments only in support of his Free Exercise claim.  Dkt. 68.  In their motion for summary judgment Defendants argue that it is unclear from the second amended complaint how the other clauses fit

1   into Plaintiff's claims and that it therefore appeared all of Plaintiff's First Amendment claims fell

2   under the Free Exercise Clause.  Dkt. 78 at 12, n. 1.  In responding to Defendants' motion,

3   Plaintiff addressed his Free Exercise claim, attempts to provide some more specific facts and

4   arguments with respect to his claim under the Establishment Clause, and does not specifically

5   address or provide additional facts or argument, that the Court can discern, on any of his other

6   claims under the other clauses of the First Amendment.

7        Generally, "[a] party cannot assert unpled theories and claims for the first time in

8   response to a motion for summary judgment."  *Madrid*, 2020 WL 7029853 (citing *Navajo*

9   *Nation*, 535 F.3d at 1080 and *Pickern*, 457 F.3d at 968-69).  Federal Rule of Civil Procedure

10  8(a)(2) requires that the allegations in the complaint "give the defendants fair notice of what the

11  plaintiff's claim is and the grounds upon which [the plaintiff] based this claim."  *Pickern*, 457

12  F.3d at 968.  Accordingly, the Court should decline to address Plaintiff's specific arguments and

13  allegations with respect to the Establishment Clause which are raised for the first time in

14  a response to Defendants' motion for summary judgment.  *Id.* at 965.[9]  Furthermore, because

15  Plaintiff also fails to provide specific facts and arguments in support of his claims under the

16  Freedom of Expression, Freedom of Speech, and Right of Expressive Association Clauses in his

17  second amended complaint and does not address them at all in his opposition to Defendants'

18  motion for summary judgment, the Court should consider these claims abandoned.  *See Jenkins*

19  *v. Cty. of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005) (a plaintiff has "abandoned ...

20  claims by not raising them in opposition to [the defendants'] motion for summary judgment.");

21  *Shakur*, 514 F.3d at 892.

22

23  _____

[9] The Court also notes that because Plaintiff did not clearly raise this claim in his second amended complaint, but presents these facts, arguments and allegations for the first time in opposition to the motion for summary judgment, the issues pertaining to this claim are not properly and fully briefed.

1    As Plaintiff's claims under the Establishment Clause, Freedom of Expression Clause,

2  Freedom of Speech Clause, and Right of Expressive Association Clause, are presented only in

3  conclusory fashion without supporting facts in the second amended complaint, the Court should

4  decline to address Plaintiff's arguments and allegations raised for the first time in opposition to

5  Defendants' motion for summary judgment and should dismiss these claims without prejudice

6  for failure to state a claim.

7    *f)    Fourteenth Amendment Equal Protection Claim*

8    Plaintiff argues Defendants violated his right to Equal Protection under the Fourteenth

9  Amendment because "no other religious group had the same policies/regulations/restrictions

10  placed on them in order to attend their religious feast [as were placed on Passover]."  Dkt. 68 at

11  8-9.

12    "Prisoners enjoy religious freedom and equal protection of the law subject to restrictions

13  and limitations necessitated by legitimate penological interests."  *Freeman*, 125 F.3d at 737.

14  Prison officials, therefore, "must afford an inmate … 'a reasonable opportunity of pursuing his

15  faith comparable to the opportunity afforded fellow prisoners who adhere to conventional

16  religious precepts.'"  *Id.* (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)).  Prison officials need

17  not make identical provisions for different faiths, but rather "must make 'good faith

18  accommodation of the [prisoners'] rights in light of practical considerations."  *Id.* (quoting *Allen*

19  *v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987)).  A plaintiff must show that the defendant

20  "intentionally acted in a discriminatory manner," although such intent sometimes may be

21  inferred by the mere fact of different treatment.  *Id.*

22    To demonstrate an Equal Protection violation, plaintiff "must show that the defendants

23  acted with an intent or purpose to discriminate against the plaintiff based upon membership in a

1    protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  To defeat

2    summary judgment, the plaintiff must "produc[e] evidence sufficient to permit a reasonable trier

3    of fact to find by a preponderance of the evidence that" the challenged action was motivated by

4    animus against the protected trait.  *FDIC v. Henderson*, 940 F.2d 465, 473 (9th Cir. 1991).

5        On the other hand, when defendants' action does not implicate a protected class such as

6    race or religion, a plaintiff may establish a "class of one" Equal Protection claim by alleging that

7    he has been intentionally treated differently from others similarly situated without any rational

8    basis for the difference in treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)

9    (per curiam).  To "'be considered similarly situated, the class of one challenger and his

10    comparators must be prima facie identical in all relevant respects or directly comparable in all

11    material respects.'"  *Warkentine v. Soria*, 152 F. Supp. 3d 1269, 1294 (E.D. Cal. 2016) (quoting

12    *U.S. v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008)).

13        Here, Plaintiff has not shown that Defendants intentionally discriminated against the

14    Plaintiff based on his membership in a protected class either in formulating the policy or in

15    applying it to Plaintiff.  In his second amended complaint, Plaintiff argues that no other religious

16    group had the same policies/regulations/restrictions placed on them in order to attend their

17    religious feast.  However, Defendants present evidence in support of their motion for summary

18    judgment that nearly identical criteria were included in the sign-up process for Ramadan in 2018

19    and 2019.  Dkt. 38 at 3-4; Dkt. 38-1 at 20-24, 26-31.  Specifically, prisoners were first asked in

20    2018 to demonstrate participation in Islamic/Muslim religious programming or halal meal

21    participation before signing up for Ramadan meals, with the requirements expanded in 2019 to

22    include a third option for a written explanation.  *Id.*  Plaintiff argues in response to Defendants'

23    motion that "[f]or Ramadan there are no other religious groups who participate in that fast other

than Muslim/Islamic faiths.  Passover however is not only celebrated by Jews and Messianic Jews, but by Christians also.  Christians are therefore similarly situated to Jews and Messianic Jews."  Dkt. 87 at 30.

But even if the DOC's Passover and Ramadan sign-up policies could be distinguished on this basis, Plaintiff does not meet his burden to show discriminatory animus.  Plaintiff points out that Defendants only consulted Jewish faith groups about Passover participation, not Christian groups, and removed Christian services from the list of services which qualified for participation from 2017 to 2018.  But this is insufficient to show that Defendants' *intent* was to discriminate against Christians.  Rather, Defendants have presented evidence, which Plaintiff does not appear to dispute, that the policy change was in fact motivated by the concerns over resource management, not by discriminatory intent.  Dkt. 38 at 2-3.  Specifically, Defendant Stewart states in her declaration that the intent of the policy was to set criteria to allow prisoners to participate in Passover while curbing sign ups from those who did not want to participate for a religious purpose but rather were just curious.  *Id.*  Furthermore, the 2019 Passover sign-up procedure did not explicitly exclude participation by Christians but, rather, included a third sign-up option whereby an individual (including, presumably, Christians) could explain their desire to participate in Passover for consideration by the facility chaplain.  In the Equal Protection context, a discriminatory purpose may not be presumed, and here Plaintiff has failed to produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the 2019 Passover sign-up policy was motivated by discriminatory animus.  *See Snowden v. Hughes*, 321 U.S. 1, 8 (1944) (requiring a showing of "intentional or purposeful discrimination" to support an Equal Protection claim and stating a "discriminatory purpose is not presumed.").

Likewise, Plaintiff fails to show that the policy as-applied to Plaintiff was motivated by

1    discriminatory animus.  Defendant Sherman requested that Plaintiff "write more" of an

2    explanation for why he wished to participate in Passover.  But Plaintiff in fact acknowledges that

3    Defendant Sherman told him that this request was motivated by the fact that he had to justify the

4    expense to the DOC, so he asked Plaintiff to "help me out and just write more."  Dkt. 86 at 4.

5    There is no evidence Defendant Sherman's actions were motivated by discriminatory animus

6    against Christians.  Rather, the record reflects his actions were motivated by economic and

7    financial considerations and the need to justify the expense of the meal to the DOC.

8        To the extent Plaintiff intends to attempt to raise a "class of one" Equal Protection claim

9    by asserting that "Passover is not only celebrated by Jews and Messianic Jews, but by Christians

10   also [and] Christians are therefore similarly situated to Jews and Messianic Jews", he raises this

11   claim for the first time in his opposition to Defendants' motion for summary judgment.  Dkt. 87

12   at 30.  Accordingly, to the extent Plaintiff intends to raise such a claim, the Court should decline

13   to address it here as it is not properly raised in his second amended complaint, nor is it even

14   clearly raised in opposition to Defendants' motion, and is subject to dismissal.[10]  *See Madrid*,

15   2020 WL 7029853; *Navajo Nation*, 535 F.3d at 1080; *Pickern*, 457 F.3d at 968-69.

16       Accordingly, Defendants' motion for summary judgment should be granted with respect

17   to Plaintiff's § 1983 Fourteenth Amendment Equal Protection claims alleging intentional

18   discrimination based on membership in a protected class, and those claims should be dismissed

19   with prejudice.  To the extent Plaintiff attempts to raise a "class of one" Equal Protection claim

20   for the first time in his opposition to the Defendants' motion for summary judgment, that claim

21   should be dismissed without prejudice as Plaintiff's second amended complaint fails to state a

22

23

---

[10] The Court notes again that because Plaintiff did not clearly raise this claim in his second amended complaint but presents this theory for the first time in opposition to the motion for summary judgment, the issues pertaining to this claim are also not properly and fully briefed.

1    claim on that basis.

2          g)    *Fourteenth Amendment Due Process Claim*

3          Plaintiff's second amended complaint alleges Defendants Warner and Russell violated his

4    Due Process rights by denying his grievances and not correcting constitutional violations that

5    were brought to their attention through the grievance process.  Dkt. 68 at 8-9.  Plaintiff also

6    alleges Defendants Sherman, Stewart, King, and Miller, "all failed to raise concerns to their

7    superiors."  *Id.*  Defendants move for summary judgment with respect to Plaintiff's Due Process

8    claims arguing that Plaintiff's allegations fail to state a claim under the Due Process clause.  Dkt.

9    78.

10         As discussed above, prisoners do not have a stand-alone Due Process right related to the

11   administrative grievance process.  *See Mann*, 855 F.2d at 640; *Ramirez*, 334 F.3d at 860.

12   "Because there is no right to any particular grievance process, it is impossible for due process to

13   have been violated by ignoring or failing to properly process grievances."  *Grigsby*, 2009 WL

14   1861172.  Thus, Plaintiff's Due Process claims related to the grievance process fail.

15         Furthermore, Plaintiff fails to cite to any relevant case law or explain how the alleged

16   general failure of Defendants Sherman, Stewart, King, and Miller "to raise concerns to their

17   superiors" violated his Due Process rights.  Accordingly, the Court finds this conclusory allegation

18   also fails to state a Due Process claim.

19         Accordingly, Defendants' motion for summary judgment should be granted with respect to

20   Plaintiff's § 1983 Fourteenth Amendment Due Process claims, and those claims should be

21   dismissed with prejudice.

22         h)    *Eighth Amendment Claim*

23

1    Defendants also argue they are entitled to summary judgment on Plaintiff's Eighth

2    Amendment claims.  Dkt. 78.

3    The Eighth Amendment's prohibition against cruel and unusual punishment protects

4    prisoners from inhumane methods of punishment and from inhumane conditions of confinement.

5    *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Conditions of confinement may,

6    consistent with the Constitution, be restrictive and harsh.  *See Rhodes v. Chapman*, 452 U.S. 337,

7    347 (1981); *Morgan*, 465 F.3d at 1045.  Prison officials must, however, provide prisoners with

8    "food, clothing, shelter, sanitation, medical care, and personal safety."  *Toussaint v. McCarthy*,

9    801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*,

10   515 U.S. 472 (1995); *see also Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

11   A prisoner claiming an Eighth Amendment violation based on conditions of confinement

12   "must [ ] objectively show that he was deprived of something sufficiently serious [and] make a

13   subjective showing that the deprivation occurred with deliberate indifference to the inmate's

14   health or safety."  *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013).

15   "To prove deliberate indifference, subjective recklessness is required, that is, an official cannot

16   be found liable under the Eighth Amendment for denying an inmate humane conditions of

17   confinement unless the official knows of and disregards an excessive risk to inmate health or

18   safety; the official must both be aware of facts from which the inference could be drawn that a

19   substantial risk of serious harm exists, and he must also draw the inference."  *Harrington v.*

20   *Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015) (quotation marks and citation omitted).

21   Plaintiff argues in his second amended complaint that preventing his participation in

22   Passover was "cruel and unusual punishment" in violation of the Eighth Amendment.  Dkt. 68 at

23   17-18.  Defendants argue in their motion for summary judgment that Plaintiff's claim does not fit

REPORT AND RECOMMENDATION - 41

the typical Eighth Amendment framework and does not seem to constitute a physical

deprivation. Dkt. 78. Defendants further argue there is no evidence that any Defendant knew of,

and was deliberately indifferent to, any serious risk of harm to Plaintiff's health or safety. *Id.* In

opposition to Defendants' motion, Plaintiff argues for the first time that because he was denied

participation in the 2019 Passover meal, he did not eat for nine days. Dkts. 86, 87.

Plaintiff identifies no facts or evidence that any Defendant knew of, and was deliberately

indifferent to, any serious risk of harm to Plaintiff's health or safety. Even if the Court considers

Plaintiff's new allegation, raised for the first time in opposition to Defendants' motion for

summary judgment, that he did not eat for nine days, Plaintiff presents no evidence that any

Defendant knew of, or was deliberately indifferent to, Plaintiff's decision not to eat. Plaintiff's

grievance does not allege that he was not eating but only that he missed Passover and Plaintiff

points to no evidence indicating that any Defendant actually knew of or was deliberately

indifferent to the fact that Plaintiff was allegedly not otherwise eating because he was not signed

up for Passover meals. *See* Dkt. 45 at 40-44.

Accordingly, Defendants' motion for summary judgment should be granted with respect

to Plaintiff's § 1983 Eighth Amendment claims, and those claims should be dismissed with

prejudice.

         i)     *Qualified Immunity*

Defendants also argue in their motion for summary judgment that, alternatively, they are

entitled to qualified immunity with respect to Plaintiff's § 1983 claims for damages.[11]

"Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the

---

[11] Because the Court has recommended dismissal of Plaintiff's other federal claims as discussed above, the Court only addresses Defendants' qualified immunity argument with respect to Plaintiff's First Amendment Free Exercise claims.

REPORT AND RECOMMENDATION - 42

1    law.'" *Gordon v. Cnty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (quoting *White v. Pauly*, 137

2    S. Ct. 548, 551 (2017)).  "In § 1983 actions, qualified immunity protects government officials

3    from liability for civil damages insofar as their conduct does not violate clearly established

4    statutory or constitutional rights of which a reasonable person would have known."  *Sampson v.*

5    *Cnty. of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020) (internal quotation marks and citations

6    omitted).  *See also Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022).  "Qualified immunity

7    balances two important interests—the need to hold public officials accountable when they

8    exercise power irresponsibly and the need to shield officials from harassment, distraction, and

9    liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231

10    (2009); *see also Ioane v. Hodges*, 939 F.3d 945, 950 (9th Cir. 2018) (as amended).

11        Unless plaintiff makes a two-part showing, qualified immunity shields government

12    officials from liability on claims for damages under § 1983.  The plaintiff must show both: (1)

13    the official(s) violated a federal statutory or constitutional right, and (2) the unlawfulness of their

14    conduct was "clearly established at the time" meaning that, at the time of the official's conduct,

15    the law was sufficiently clear that every reasonable official would understand that what he is

16    doing is unlawful.  *City of Escondido v. Emmons*, 139 S.Ct. 500 (2019); *District of Columbia v.*

17    *Wesby,* 138 S.Ct. 577, 589 (2018).

18        When qualified immunity is reviewed in the context of a defense motion for summary

19    judgment, the evidence must be considered in the light most favorable to the plaintiff with

20    respect to central facts.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).  "Government

21    officials are not entitled to qualified immunity if (1) the facts '[t]aken in the light most favorable

22    to the party asserting the injury ... show [that] the [defendants'] conduct violated a constitutional

23    right' and (2) 'the right was clearly established' at the time of the alleged violation."  *Bonivert v.*

1    *City of Clarkston*, 883 F.3d 865, 871–72 (9th Cir. 2018) (quoting *Saucier v. Katz*, 533 U.S. 194,

2    201, (2001), *rev'd on other grounds by Pearson*, 555 U.S. 223; *see also Saucier*, 533 U.S. at 202

3    ("The relevant, dispositive inquiry in determining whether a right is clearly established is

4    whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

5    confronted."). If a "genuine issue of material fact exists that prevents a determination of

6    qualified immunity at summary judgment, the case must proceed to trial." *Serrano v. Francis*,

7    345 F.3d 1071, 1077 (9th Cir. 2003). "Once the defense of qualified immunity is raised by the

8    defendant, the plaintiff bears the burden of showing that the rights allegedly violated were

9    'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). Moreover,

10   "'[the] two prongs of the [qualified immunity] analysis need not be considered in any particular

11   order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity

12   defense.'" *Scott v. Cty. of San Bernardino*, 903 F.3d 943, 948 (9th Cir. 2018) (quoting *Shafer v.*

13   *Cty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017))

14       To determine whether there was clearly established law, the Court has stated, "[w]hile

15   there does not have to be a case directly on point, existing precedent must place the lawfulness of

16   the particular [action] beyond debate." *Wesby*, 138 S.Ct. at 590. A clearly established right

17   exists if "controlling authority or a robust consensus of cases of persuasive authority" have held,

18   on facts that are close or analogous to the current case, that such a right exists. *Hines v. Youseff*,

19   914 F.3d 1218, 1229 (9th Cir. 2019). "Clearly established law" should not be defined at a high

20   level of generality; it must be "particularized" to the facts of the case. *See White v. Pauly*, 137 S.

21   Ct. 548, 551 (2017); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The Supreme Court has

22   repeatedly admonished the Ninth Circuit not to define clearly established law at a high level of

23   generality. *See, e.g, City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015).

1    "To be clearly established, a right must be sufficiently clear that every reasonable official

2    would have understood that what he is doing violates that right." *Taylor v. Barkes,* 575 U.S. 822

3    (2015) (per curiam); *see also Sampson*, 974 F.3d at 1018–19 (internal quotation marks and

4    citation omitted) ("A constitutional right is clearly established if every reasonable official would

5    have understood that what he is doing violates that right at the time of his conduct.").  Even if the

6    violated right was clearly established at the time of the violation, it may be "difficult for [the

7    defendant] to determine how the relevant legal doctrine … will apply to the factual situation the

8    [defendant] confronts… . [Therefore, i]f the [defendant's] mistake as to what the law requires is

9    reasonable ... the [defendant] is entitled to the immunity defense." *Saucier*, 533 U.S. at 205;

10   *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).  Moreover, the "high

11   standard is intended to give officers breathing room to make reasonable but mistaken judgments

12   about open legal questions." *Ioane*, 939 F.3d at 956 (internal quotation marks and citation

13   omitted).

14   The First Amendment guarantees prisoners the right to the free exercise of their

15   religion. *Cruz v. Beto*, 405 U.S. 319, 323 (1972).  Furthermore, a prisoner has the "right to be

16   provided with food sufficient to sustain [him] in good health that satisfies the dietary laws of

17   [his] religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987) (per curiam).  However,

18   these rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to

19   achieve legitimate correctional goals or to maintain prison security." *O'Lone*, 482 U.S. at 348.

20   The Ninth Circuit has determined that a prison may require inmates to proceed through an

21   application process in order to receive a religious diet. *Resnick*, 348 F.3d at 768.  Specifically,

22   the Ninth Circuit has held that, applying the *Turner* test, requiring an inmate to complete a

23

1   standardized written application to receive a religious diet does not unreasonably burden the

2   inmate's right to free exercise. *Id.* at 770–71.

3        Here, Plaintiff "has not brought to our attention, and our independent research does not

4   reveal, case law involving the particular circumstances presented by this case." *Walker v.*

5   *Gomez*, 370 F.3d 969, 977–78 (9th Cir. 2004).  Plaintiff points to no clearly established law, nor

6   is the Court aware of any, holding, on facts that are closely analogous to the current case, that

7   Plaintiff's rights under the First Amendment would be violated by Defendant's actions.  More

8   specifically, Plaintiff points to no clearly established law, nor is the Court aware of any, holding

9   that all Christian inmates have a constitutional right to Passover meals during Passover without

10  completing an application explaining how participation in Passover is part of their sincerely held

11  religious beliefs.  Plaintiff also points to no clearly established law, nor is the Court aware of

12  any, holding that at the time of the events giving rise to Plaintiff's claims, a prisoner's

13  constitutional rights would be violated by a policy requiring that they meet the following criteria

14  to participate in Passover or another religious meal: (1) have participated in Jewish, Messianic,

15  or religious programming applicable to the Jewish faith for some period of time, (2) be on the

16  kosher meal plan, or (3) that they provide an explanation for why they wish to participate in

17  Passover, which the facility chaplain can consider and grant or deny in their discretion.  Nor is

18  the Court aware of any clearly established law that requiring more information from a Christian

19  prisoner who states in his application to participate in Passover that he wishes to do so because

20  Passover is part of the Old Testament, violates a constitutional right.

21        Plaintiff cites no case, nor is the Court aware of any, clearly establishing a First

22  Amendment right to Passover meals, or other religious meals, under the above, or factually

23  analogous, circumstances.  *See, e.g., Barnes v. Furman*, 629 Fed. App'x 52, 54-55 (2d Cir. Oct.

1    22, 2015) (holding that a prison official "was not unreasonable" in denying a prisoner kosher

2    meals "because he was registered as Hebrew Israelite in accordance with the prison policy

3    limiting kosher meals to Jewish inmates") (summary order); *Piatnitsky*, 2019 WL 2233342, at

4    *17 ("Because it was not clearly established at the time of the violation that a policy granting

5    Passover participation for only those inmates who received kosher meals or attended religious

6    services was unconstitutional, or that defendants were required to provide plaintiff with Passover

7    meals regardless of the policy, defendants are entitled to qualified immunity against plaintiff's

8    claims for damages."), *report and recommendation adopted*, 2019 WL 2224930 (W.D. Wash.

9    May 23, 2019).

10        Accordingly, the Court finds that Defendant Sherman is entitled to qualified immunity on

11   Plaintiff's First Amendment Free Exercise § 1983 claims for damages and Defendants' motion

12   for summary judgment should be granted and those claims should be dismissed with prejudice.

13                    *j)*        *Requests for Injunctive or Declaratory Relief*

14        As noted above, Plaintiff's second amended complaint does not appear to seek any

15   specific injunctive or declaratory relief but, instead, seeks only monetary damages and "such

16   other and further relief as the Court deems just an[d] proper." Dkt. 68. However, to the extent

17   Plaintiff's second amended complaint can be construed to seek injunctive or declaratory relief

18   related to his First, Fourteenth and Eighth Amendment claims, the Court should deny those

19   claims as moot.

20        Plaintiff's claims for injunctive relief are moot for the same reasons that apply to his

21   RLUIPA claim, discussed above. Specifically, the DOC has changed the policy that prevented

22   Plaintiff from receiving Passover meals in 2019, Plaintiff received those meals in 2020 and 2022

23

1    and acknowledges he did not attempt to sign up in 2021.  As discussed above, Plaintiff has also

2    not shown that any exception to the mootness doctrine applies in this case.

3         Similarly, in determining whether declaratory judgment is appropriate, the Court must

4    assess "whether the facts alleged, under all the circumstances, show that there is a substantial

5    controversy, between parties having adverse legal interests, of sufficient immediacy and reality

6    to warrant the issuance of a declaratory judgment."  *Bayer v. Neiman Marcus Group, Inc.*, 861

7    F.3d 853, 867-68 (9th Cir. 2017) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118,

8    127 (2007)).  "If there is no case or controversy—that is, if the alleged constitutional violations

9    have ceased—then the request for declaratory relief is moot and should be dismissed."  *See*

10   *Piatnitsky*, 2019 WL 2233342, at *17–18 (citing *Bayer*, 861 F.3d at 864, 868).  Here, plaintiff's

11   request for declaratory relief is moot for the same reasons his claim for injunctive relief is moot.

12        Accordingly, to the extent Plaintiff's second amended complaint can be construed to seek

13   injunctive or declaratory relief related to his First, Fourteenth and Eighth Amendment claims, the

14   Court should deny those claims as moot.

15            k)    State Law Claims

16        Plaintiff also asserts state law claims under the Washington State Constitution.  A district

17   court has discretion over whether to exercise supplemental jurisdiction over state law claims

18   arising from the same set of operative facts that supports a federal claim.  *See Carlsbad Tech.,*

19   *Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639-40 (2009) (citing 28 U.S.C. §§ 1367(a), (c)).  Ordinarily,

20   when a district court dismisses "all claims independently qualifying for the exercise of federal

21   jurisdiction," it will dismiss all related state claims, as well.  *Artis v. District of Columbia*, No.

22   16-460, 2018 WL 491524, 138 S.Ct. 594, 598 (citing 28 U.S.C. § 1367(c)) (2018); *see also*

23   *Carlsbad Tech.*, 556 U.S. at 639-40.  Although the court is not required to dismiss the

1   supplemental state law claims, "in the usual case in which all federal-law claims are eliminated

2   before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—

3   judicial economy, fairness, convenience, and comity—will point toward declining to exercise

4   jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.

5   343, 350 n.7 (1988).

6        In this case, the undersigned has recommended granting Defendant's motion for summary

7   judgment and dismissing all of Plaintiff's federal claims. Furthermore, it appears to the Court

8   that none of the factors under the pendent jurisdiction doctrine support exercising supplemental

9   jurisdiction in the event the federal claims are dismissed. Accordingly, if the Court adopts the

10  recommendation to dismiss Plaintiff's federal claims, the undersigned recommends that the

11  Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss

12  those claims without prejudice.[12]

13  <u>CONCLUSION</u>

14       Based on the foregoing discussion, the undersigned recommends that Defendants' motion

15  for summary judgment, Dkt. 78, be GRANTED, as provided above, and that Plaintiff's federal

16  claims under RLUIPA, the First Amendment Free Exercise Clause, the Eighth Amendment, the

17  Fourteenth Amendment Due Process Clause, and Plaintiff's Fourteenth Amendment Equal

18  Protection claim alleging intentional discrimination based on membership in a protected class, be

19  dismissed with prejudice. The undersigned further recommends that the Court dismiss without

20

21  [12] The Court notes that 28 U.S.C. § 1367(d) provides that when a federal court declines supplemental
    jurisdiction over a state-law claim, the limitations period for that claim "shall be tolled while the claim is

22  pending" in federal court "and for a period of 30 days after it is dismissed unless State law provides for a
    longer tolling period." *Id*; *see Curry v. Vancouver Housing Authority*, 22 Wn.App.2d 1027 (2022) *review

23  denied*, 2022 WL 6958078 (Wash. Oct. 12, 2022) ("The purpose of section 1367(d) is to protect plaintiffs
    who choose to assert supplemental state law claims in a federal action… If the federal court declines to
    exercise supplemental jurisdiction over state law claims, the plaintiff may assert them in a new action in
    state court without fear of being barred by the statute of limitations.").

prejudice Plaintiff's other federal claims purportedly raised under the other clauses of the First Amendment (Establishment Clause, Freedom of Expression Clause, Freedom of Speech Clause, and Right of Expressive Association Clause) and Plaintiff's "class of one" Fourteenth Amendment Equal Protection claim.  If the Court adopts the recommendation to dismiss Plaintiff's federal claims, the undersigned further recommends that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss those claims without prejudice.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **November 18, 2022**.

Dated this 21st day of October, 2022.

_____
S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION - 50